1                    UNITED STATES DISTRICT COURT
                    CENTRAL DISTRICT OF CALIFORNIA
2                    WESTERN DIVISION - LOS ANGELES

3

4    UNITED STATES OF AMERICA,    )   Case No. CR 24-621-MWF-6
                                  )
5          Plaintiff,            )   Los Angeles, California
                                  )   Thursday, December 12, 2024
6              v.                 )   2:23 P.M. to 3:29 P.M.
                                  )
7    DURK BANKS,                  )
                                  )
8          Defendant.            )
     _____)
9

10

11

12                    TRANSCRIPT OF PROCEEDINGS
                BEFORE THE HONORABLE PATRICIA DONAHUE
13                 UNITED STATES MAGISTRATE JUDGE

14

15   Appearances:                See Page 2

16   Deputy Clerk:               Isabel Verduzco

17   Court Reporter:             Recorded; CourtSmart

18   Transcription Service:      JAMS Certified Transcription
                                  16000 Ventura Boulevard #1010
19                                Encino, California  91436
                                  (661) 609-4528
20

21

22

23

24
     Proceedings recorded by electronic sound recording;
25   transcript produced by transcription service.

1  APPEARANCES:

2  For the Plaintiff:          United States Attorney's Office
                               Central District of California
3                             By:  IAN YANNIELLO
                               312 North Spring Street, Suite 1200
4                             Los Angeles, California  90012
                               (213) 894-3667
5                             ian.yanniello@usdoj.gov

6                             United States Attorney's Office
                               Central District of California
7                             International Narcotics, Money
                               Laundering, and Racketeering
8                             By:  DANIEL H. WEINER
                               312 North Spring Street, 14th Floor
9                             Los Angeles, California  90012
                               (213) 894-0813
10                            daniel.weiner@usdoj.gov

11                            United States Attorney's Office
                               Central District of California
12                            By:  GREGORY W. STAPLES
                               411 West Fourth Street, Suite 8000
13                            Santa, Ana, California  92701
                               (714) 338-3500
14                            greg.staples@usdoj.gov

15
   For the Defendant:          The Findling Law Firm PC
16                            By:  DREW FINDLING
                                    MARISSA H. GOLDBERG
17                            3575 Piedmont Road, NE
                               Tower 15, Suite 1010
18                            Atlanta, Georgia  30305
                               (404) 460-4500
19                            marissa@findlinglawfirm.com

20                            Breen and Pugh
                               By:  JONATHAN M. BRAYMAN
21                            53 W. Jackson Boulevard, Suite 1550
                               Chicago, Illinois  60604
22                            (312) 360-1001
                               jbrayman@breenpughlaw.com
23
                               The Law Office of Christy O'Connor
24                            By:  CHRISTY O'CONNOR
                               360 East Second Street, Suite 800
25                            Los Angeles, California  90012
                               (323) 716-5959
                               christy@christyoconnorlaw.com

1    APPEARANCES (Con't):

2    Also Present:            FATIMA VAZQUEZ
                             United States Probation and Pretrial
3                            Services

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  LOS ANGELES, CALIFORNIA, THURSDAY, DECEMBER 12, 2024, 2:23 P.M.

2      (Call to Order of the Court.)

3          THE CLERK:  Calling Case No. CR 24-621-MWF-6,

4  *United States v. Durk Banks*.

5          Counsel, please state your appearances.

6          IAN YANNIELLO:  Good afternoon, Your Honor.

7  Ian Yanniello, Gregory Staples, and Danny Weiner on behalf of

8  the United States.

9          THE COURT:  Good afternoon.

10         GREGORY W. STAPLES:  Good afternoon.

11         DANIEL H. WEINER:  Good afternoon.

12         DREW FINDLING:  Good afternoon, Your Honor.

13  Drew Findling, Jonathan Brayman, Marissa Goldberg,

14  Christy O'Connor, and Mr. Banks present.  Thank you.

15         THE COURT:  All right.  Good afternoon.  We are

16  here for the detention hearing, which was continued to today

17  at the request of the defendant.

18         Is the defense prepared to go forward today with

19  the detention hearing?

20         MR. FINDLING:  We are, Your Honor.

21         THE COURT:  All right.  Then I'll begin by asking

22  the Government to please identify what the Government

23  proffers in support of the detention request.

24         MR. YANNIELLO:  Yes, Your Honor.  The Government

25  proffers the Complaint in this case, the First Superseding

1  Indictment, the brief the Government filed today along with

2  its -- the two exhibits, one of which was filed under seal.

3  When I spoke with counsel prior to this hearing, to the

4  extent that there's any specifics discussed related to that

5  exhibit, the Government would ask those conversations take

6  place at sidebar.

7        The Government also proffer the Pretrial Services

8  Report as well as its recommendation of detention, though the

9  Government disagrees with the conclusion that flight risk is

10 not a basis for detention.  The Government submits that both

11 flight and danger are ongoing and would believe that

12 Mr. Banks should be detained on both counts.

13       THE COURT:  All right.  Thank you.  I have reviewed

14 all of those materials and signed the order granting the

15 Government's ex parte application to seal Exhibit 2.

16       Were -- was the Government's brief, as well as all

17 of the materials, including the sealed material, served on

18 defense counsel?

19       MR. YANNIELLO:  Yes, Your Honor.  The under-seal

20 portion was served, and then the Pacer notification would

21 have provided notice and service to -- related to the

22 publicly filed documents.

23       THE COURT:  All right.  Thank you.

24       Then I will hear argument beginning with the

25 Government.

1          MR. YANNIELLO:  Thank you, Your Honor.

2          The Government's positions are set forth in its

3    briefing.  I think this room is a good barometer for -- a

4    good bellwether for the fact that the defendant is a powerful

5    and influential man.  He has significant resources, as

6    evidenced by the bond -- proposed bond package that he's

7    submitted, but this case is about how he's used that power,

8    how he's used that influence, and how he's used those

9    resources, and he used those to promote and perpetuate

10   violence with deadly consequence.

11         Defendant is alleged to have committed this murder

12   with other coconspirators, hitmen who defendant orchestrated

13   and caused to fly from Chicago and conduct a brazen,

14   calculated murder in broad daylight outside one of the

15   busiest malls in the country.  About 4:00 p.m. in the

16   afternoon with cars driving by, machine gun fire rained down

17   attempting to murder a rival, ultimately striking somebody

18   who was in the vehicle with that person, and by nothing short

19   of a miracle, nobody else was killed during that encounter.

20         The brazenness of the conduct, the allegations, the

21   other information before the Court warrant detention in this

22   matter.  There are no conditions or combination of conditions

23   that can ensure defendant's appearance or mitigate the risk

24   of continued danger to both the community and witnesses in

25   this case.

1          THE COURT:  You referenced Pretrial Services

2    recommendation with regard to the risk of flight.  Could you

3    just give a bit more background to the reason why the

4    Government contends that the detention is warranted here

5    based on serious flight risk?

6          MR. YANNIELLO:  Sure, Your Honor.

7          So I think -- let's go back in time to some of the

8    -- some of what happened here.

9          So following the murder, defendant's coconspirators

10   were charged in an indictment, and the date that that

11   indictment was unsealed the FBI conducted multiple search

12   warrants, made arrests of those codefendants.  Defendant was

13   not yet indicted or charged in this case.  On that same day,

14   defendant booked -- FBI received notice that the defendant

15   was booked on three international flights, one -- at least

16   one of which -- we believe multiple of those flights were

17   destined for Dubai, but at least one of those flights was

18   destined to a nonextradition country.  Defendant was

19   ultimately arrested pursuant to a complaint at the airport

20   essentially prepared to board that flight with luggage and

21   everything else.

22          So the Government submits that that evidence is

23   defendant's intent.  As the walls were closing in, he

24   attempted to flee, he attempted to board an international

25   flight, and now he's fully aware of the FBI's ability to

1   track flight records and track boarding records, and so the

2   Government believes that he's a sophisticated, smart man; to

3   the extent that he wants to flee, he's going to be able to do

4   it by not booking a flight and simply crossing the border

5   just south of us that's a couple-hour car ride.

6           THE COURT:  All right.  Thank you, Counsel.

7           All right.  I will hear from the defense.  I have

8   received a binder from the defense with four tabs with

9   various documents, which was delivered to the Court today,

10  and I have reviewed all of those materials.  I'll hear

11  argument from the defense.

12          MR. FINDLING:  Your Honor, Mr. Brayman is going to

13  begin our presentation.  I'll follow up at the Court's

14  permission.

15          THE COURT:  All right.  Thank you.

16          MR. FINDLING:  Thank you so much, Your Honor.

17          JONATHAN M. BRAYMAN:  Thank you, Judge.

18          And in the way that we have it divided up is I'm

19  going through some of the mitigation and personal details of

20  Mr. Banks's life growing up in Chicago, and then Mr. Findling

21  is going to follow up with some of his professional

22  accomplishments, connections, and all the things that he has

23  done in his professional life as a musical artist.

24          Judge, in terms of Mr. Banks --

25          THE COURT:  Hold a moment.

1                    MR. BRAYMAN:  Sure.

2                    (Clerk speaks with the Court.)

3                    THE COURT:  All right.  Would you please go to the

4    lectern?

5                    MR. BRAYMAN:  Yes.  Thank you, Judge.

6                    Judge, in terms of Mr. Banks's background, he grew

7    up -- he was born and raised in Chicago -- on the Southside

8    of Chicago in the Englewood neighborhood.  It is one of the

9    most economically depressed neighborhoods in Chicago.  He was

10   raised by a woman that is here in court today.

11   Lashawnda Woodard, who's in the first row here in court in

12   the white shirt, is his mother, and she raised him, along

13   with his grandmother Hattie in a house at 7220 South Halstead

14   in Chicago.

15                   He was raised there in a home full of love and

16   surrounded by five siblings.  He had an older brother by the

17   name of Dante, and he also has a father by the name of

18   Dante Banks who had -- at a very early age in Mr. Banks's

19   life was incarcerated -- at seven months old.  Mr. Banks's

20   dad was incarcerated up until a period of time a few years

21   ago.  Since Mr. Banks's father has come home, he's a man of

22   faith now.  He is somebody that participates in his faith

23   community and his family, and he's dedicated to his community

24   in Chicago.  He has worked with Chicago CRED -- C-R-E-D --

25   which is a gun-violence-reduction program that was started by

1    former U.S. Secretary of Education Arnie Duncan in Chicago.

2            And essentially, Judge, growing up in Englewood,

3    Mr. Banks was no doubt surrounded by violence, gangs, drugs,

4    and music was his way out of that community.  His mom talks

5    about him writing at an early age, and it was his way to

6    express himself about what he was feeling at the time and

7    what he was going through in Chicago.  And in -- around the

8    time that he was 17, 18 years old, he started to make a name

9    for himself.  In 2012 him and his older brother started a

10   group "Only the Family," which was fittingly named "Only the

11   Family" because it was him and his older brother Dante, and

12   in 2013 Def Jam records signed Mr. Banks to a multi-record

13   deal that ultimately allowed Mr. Banks to move out of

14   Chicago, move his family out of Chicago, and he moved to

15   Atlanta in Fulton County, where he lived for a couple years.

16           Once he was in Fulton County -- and, Judge, you do

17   have a Pretrial Report that has a criminal case from

18   Fulton County.  We have shared documents from that case.  It

19   was a dismissed case, but ultimately we have shared documents

20   both with the Government and Pretrial Services that show that

21   after Mr. Banks was arrested in that case -- he was arrested

22   with a couple codefendants -- that he was in strict

23   compliance with Judge Farmer's orders there.  He was

24   initially -- he was initially set two conditions that

25   included GPS monitor, curfew, reporting, no contact with any

1    witnesses, and because of his strict compliance, Judge Farmer

2    over time eased the conditions.  He allowed Mr. Banks to

3    continue to engage in gainful employment as a musician and a

4    recording artist.  He traveled with the consent and

5    permission of the court, both in this country and also

6    internationally.

7           And since the time that he moved out of Chicago, he

8    has traveled extensively for business purposes, Judge, and I

9    think in the --

10          THE COURT:  Let me just ask you a question with

11    regard to you mentioned that he was being supervised by the

12    court in -- or under supervision order of the court in

13    Fulton County.  Was he under that supervision order at the

14    time of the conduct that is alleged in this case?

15          MR. BRAYMAN:  We had just looked at the documents.

16    I think ultimately the declination of prosecution happened

17    October 17, 2022.  The allegation that is at the heart of

18    this case is from about two months earlier, August 19, 2022.

19    I think he was still under supervision at that time.  Judge,

20    obviously we contest his involvement in what is charged in

21    this case, but, Judge, I think at that time it was -- the

22    district attorney in Fulton County was in the process of

23    essentially dismissing that case and -- so, Judge, but in

24    that case there was never a suggestion of any type of -- any

25    type of violation, and because he was doing so well on

1    Pretrial Services, Judge Farmer there allowed him to travel,

2    continue to support his family, and continue to engage in

3    gainful employment.

4              Judge, some of the other good things about

5    Mr. Banks is that he did move out of Chicago, and he moved to

6    Atlanta for a couple years, and ultimately something that you

7    don't always have when you have people that were born in

8    other states is that Mr. Banks actually has extensive social

9    and economic ties to this district, to the Central District

10   of California, and that he lived here and has lived here for

11   the last several years, that he moved to Los Angeles in 2019.

12             Also, Judge, in terms of his good works and his

13   acts of service, he founded a foundation, a 501(c)(3)

14   nonprofit organization called "Neighborhood Heroes."  The CEO

15   of that foundation is here in court -- Kevin Freeman, who's

16   the gentleman raising his hand in the front row there -- and

17   some of the things that they did in Chicago and elsewhere was

18   in April of 2020 they helped bring hot meals to frontline

19   workers in Chicago at Mercy Hospital, they helped feed

20   thousands of families for Thanksgiving in 2021 and '22, and

21   they have encouraged education in communities in Chicago,

22   Atlanta, and elsewhere, for young people to be able to go to

23   colleges and historic -- HCBUs and Howard University.  They

24   have allowed young people to be able to live to their full

25   potential, like Mr. Banks has done.

```
 1            Judge, his story is -- it's one of maturity, it's
 2   one of growth, and it's one of trying to do better for him
 3   and his family.
 4            And, Judge, that's all I have to say in terms of
 5   the personal aspect.  I think Mr. Findling will follow up
 6   with some professional details about --
 7            THE COURT:  And I just have --
 8            MR. BRAYMAN:  -- his life as an artist.
 9            THE COURT:  -- one question about something you
10   said just so I understand.  He has lived in Los Angeles, in
11   the Central District of California since 2019?
12            MR. BRAYMAN:  Yes, Judge.  And I think it's
13   reflected -- I just read the Pretrial Report that we
14   received.  I believe it's reflected in the Pretrial Report --
15   2019 -- and then I think up until June -- or July of 2024.
16   He does own a  property in Florida.  He owns two properties
17   in Georgia, which are part of the bond submission, and I'll
18   let Mr. Findling follow up with that information.
19            THE COURT:  All right.  Thank you.
20            MR. BRAYMAN:  Thank you, Judge.
21            MR. FINDLING:  Your Honor, my name is
22   Drew Findling.  Thank you for the privilege of appearing here
23   today.
24            I do want to add some context.  I know you asked
25   Mr. Brayman about Fulton County.  My law partner
```

 1   Marissa Goldberg and I -- our offices are in Fulton County.

 2   I -- that's where my career is, my -- one of my daughters is

 3   a public defender there, my son was, I was a public defender;

 4   so I know the county pretty well, and I just for a second

 5   want to give you some context.

 6            That case that the Government there --

 7   Fulton County -- the district attorney's office declined to

 8   prosecute is a case that takes RICO cases and gang cases very

 9   seriously.  They seldom decline to prosecute a case.  You may

10   know from the news that they pursued a RICO case and continue

11   to stand by a RICO case against the former president of the

12   United States of America.  They made national news with a

13   two-year trial in the YSL RICO case.  They tried the YFN RICO

14   case.

15            All of these are gang-related cases where the

16   attorneys, I can assure you -- because we've been part of

17   some of them -- have begged for declining prosecutions.  Our

18   district attorney -- because that's where I live --

19   Fani Willis seldom will decline a case.  So it is quite a

20   statement that she declined to prosecute this case, coupled

21   with the fact that The Honorable Judge Farmer --

22   Judge Kevin Farmer is a no-nonsense judge.  So he had to sign

23   off on that declined case.  That combination says a lot about

24   the potency of that particular prosecution.

25            Your Honor, I do want to immediately respond --

1  there's some issues I want to get to, and respectfully, the

2  Government began their presentation by looking over their

3  right and left shoulder and telling you that this was a

4  testament to the powerful and influential nature of

5  Mr. Banks.  I would respectfully disagree with counsel.

6          I would say, rather, the interest in Mr. Banks --

7  because, quite frankly, I didn't know a lot about him before

8  I became his lawyer, but what I've learned is really common,

9  which is that there is an interest level in him in the

10  community and the media for some of the reasons that

11  Mr. Brayman alluded to, and that is a young man whose dad

12  went to jail when he was just seven months old and was raised

13  in a three-bedroom apartment with his mother, his aunt, his

14  brother, and two sisters, and literally, as is reported,

15  spent many of those years literally sleeping on the floor as

16  his mom tried to survive, but as Mr. Brayman mentioned, he

17  then turned to music, and that really changed his -- that

18  changed his life.

19          So I want to, for our purposes, talk about two

20  important issues.  The Government of course took the position

21  that they disagreed -- and I'll get to that in a second --

22  with the Pretrial Services Report, and respectfully, we

23  disagree with the report because it finds a reason to detain

24  our client.  We think, as the package reflects -- and I'll

25  talk about in a few minutes -- that he should be released

1    with strict conditions on bail.

2          But first, I want to talk about the appearance of

3    Mr. Banks as required because nevertheless the Government

4    contested that's something for the Court to take into

5    consideration.  Again, respectfully to counsel for the

6    Government, I don't think that if he's released there's

7    nothing that we've found that indicates -- this is the first

8    I've heard of it -- there's some concern that he's two hours

9    from the Mexican border.  I've not seen anything to do that

10   -- with this case.

11         However, it is true that Mr. Banks, as so many

12   people in his situation, travel internationally.  He is an

13   international recording artist, and I will tell you that he

14   does -- he has flown to Dubai, absolutely, over the last two

15   years, and there's reasons for that.  One, of course, in

16   2019, after waiting to have a relationship and to be with his

17   dad other than in jail visits -- his dad was out.  His dad

18   turned to the Muslim faith.  He in turn embraced the Muslim

19   faith, and of course to many, the heartland of that faith is

20   in the UAE, and he spent time there.

21         But importantly, that is a big part of his

22   profession.  Having that relationship in the UAE -- I will

23   tell Your Honor that we come from Atlanta, the kind of -- you

24   know, the -- some people call it the "Hip Hop Hollywood."

25   It's impossible to get a flight because the music industry

1    goes back and forth there.  That is a big place for

2    performances.  Mr. Banks has performed there, and if you have

3    made it in his musical genre, that is an incredible place to

4    make an income.  So that is not unusual.  And so the record

5    is really clear that he has flown to the UAE.  We don't deny

6    that.  We don't debate that.  We don't fight that.

7              In fact, he was -- just four days before he was

8    taken into custody -- excuse me -- four days before -- he

9    came back -- excuse me -- from being in London -- this is

10   referred to in some of the documents you received.  He was in

11   the U.K., and I want to tell the Court why he was in the

12   U.K., because he was in the U.K. because Mr. Banks, who is --

13   our position -- is not a threat to the community, is not a

14   threat to leave the jurisdiction but respect the rules and

15   the direction of the court -- was in the U.K. as a guest of

16   the NFL Chicago Bears.  He actually was in a suite watching

17   the game with the mayor of London and the mayor of Chicago.

18   He was the guest of the Chicago Bears.  He actually spent

19   time with Roger Goodell, the commissioner.  So these are the

20   kind of people that have embraced him because of his

21   community outreach we'll talk about in a second.

22             He comes back from that trip to the U.K., and

23   that's when he has -- as Your Honor can see from some of the

24   documents, there's a search warrant for his phone.  Now, if

25   he is so concerned about fleeing the jurisdiction of anywhere

1  in the United States and heading for the Mexico border,

2  heading for somewhere else -- when his phone is taken from

3  him, if he's so concerned about what's going to be on that

4  phone, that's the time to leave.

5        But what does happen is exactly four days after his

6  phone is taken by the Government, by the FBI so they can look

7  into it, he performs in front of 19,000-plus people in an

8  arena -- the United arena in Chicago for a birthday

9  celebration for himself -- sold out.  He's in front of 19,000

10  people performing.  So there was no fear on his part that

11  they had his phone and four days later he's going to take

12  off, but rather he does this performance.

13        And so I want to address for a second the

14  Government told you that he had this concern and booked these

15  flights.  I will tell you that -- I agree with the

16  Government.  There were reservations that were made because

17  he was going to the UAE.  And we've looked at documents, and

18  I want to share something with the Court.

19        There -- I know the Government wasn't specific, but

20  looking at the original complaint and some of the documents,

21  there was this belief that there was a reservation to Dubai,

22  then there was a reservation to Switzerland, and ultimately a

23  private flight.  I will tell you, we've been trying to gather

24  the private flight information, and it appears over

25  approximately a 13-month period of time he took as many as

 1  two dozen private flights.  Good decision or bad decision,

 2  economically that is part of his musical industry.  They keep

 3  the private flight companies -- the charter flights very,

 4  very busy.

 5         But specifically, I will share -- and I can -- I'm

 6  going to give a copy -- because I want to share this with the

 7  Government so that we can correct their understanding.  This

 8  is the e-ticket.

 9         Counsel, can I -- yeah.

10         And, Your Honor, would you like me to give it to

11  the clerk so they can give this to you?

12         THE COURT:  You can approach and hand it to my

13  courtroom deputy.

14         MR. FINDLING:  Okay.

15         (Pause.)

16         MR. FINDLING:  And, Your Honor, we'd be happy to

17  mark these at the end of the hearing for convenience of

18  everybody.  We're keeping track of them, and so we'll mark

19  them at the conclusion, not to take away from the flow of the

20  hearing.

21         And I think what -- there was some confusion -- and

22  I -- again, I know that our colleagues from the Government

23  are relying on agents to get them this information; so I

24  don't in any way think this is a fault, deliberate, but

25  you'll see that this was -- the ultimate destination was

1    actually the UAE.  So there was a flight from Florida to

2    Newark, Newark to Paris -- to Zurich -- excuse me -- and then

3    the third part of the ticket is Zurich to Dubai.  For some

4    reason, whoever researched this case for the Government, took

5    the position that it ended at Zurich.  Had that person or

6    persons done that additional research and just flipped over

7    to the next page when they did their investigation, they

8    would have seen that this was ultimately going to go to the

9    UAE.

10          Now, here's what happens is that Mr. Banks has

11   gotten to the point of his life -- maybe he grew up under the

12   most dire of socioeconomic circumstances, but you'll see he

13   was only able to get a reservation for this 24-hour trek on

14   economy, and he made a decision to ultimately book a private

15   plane, and that's, as the Government said, when he was taken

16   into custody.  Unequivocally, he was taking that private

17   plane, which was going to change in Europe -- I believe in

18   Italy -- but ultimately that was going to go to the UAE as

19   well.  But there was no flight to Switzerland --

20          THE COURT:  So just so I'm clear, the e-ticket

21   itinerary and receipt that you just provided me for this

22   flight -- Mr. Banks did not take this flight on

23   United Airlines.

24          MR. FINDLING:  That's correct.

25          THE COURT:  He was prepared to board a private

 1  plane in Miami; correct?

 2          MR. FINDLING:  That is correct, Your Honor.

 3          THE COURT:  All right.

 4          MR. FINDLING:  And we have talked with everybody

 5  involved in his world.  It is not unusual -- as it's not

 6  unusual for business folks, to make reservations and then

 7  pick the flight that works best for them, he opted to --

 8  although he never got on it -- to not sit in -- wherever it

 9  was -- in economy for the 24-hour trek but to fly private.

10  We've done our due diligence and been able to determine,

11  again, in about a 12- or 13-month period as many as

12  24 private flights.  So this is not something inconsistent

13  with his lifestyle.

14          THE COURT:  Let me just ask you, then.  This

15  United Airlines ticket was booked at the last minute?

16  Because it's a -- as you said, it's an economy ticket.

17          MR. FINDLING:  Yes.

18          THE COURT:  Part of it is economy because it was

19  booked at the last minute?

20          MR. FINDLING:  That's correct, Your Honor.

21          THE COURT:  Okay.

22          MR. FINDLING:  Yes.  Yes.  This was not done -- and

23  from our understanding, this is the way he's always booking

24  things, and I could just tell you from our representation of

25  folks in this industry, they're not doing like my wife and I

1    do, which is books things a month in advance because we're

2    anxiety ridden about not getting a flight.  Everything is

3    last minute.  This is apparently not inconsistent with how he

4    -- with how he travels.  But we were able to determine these

5    flights to UAE are not unusual for him and in fact something

6    that is more usual than not.

7              Your Honor, when --

8              THE COURT:  All right.  Let me just ask you, if you

9    know, does the United States have an extradition treaty with

10   the United Arab Emirates?

11             MR. FINDLING:  So we -- we've looked into it.  We

12   do not see that there's an extradition treaty between the

13   countries.  And of course he's been going back and forth

14   there.  So this would have to have been, you know -- I would

15   say that this would be a concern if this were his first time

16   going there, but he has deep roots there.  And in fact, I

17   know there's another witness in this case that has received a

18   subject letter that went there and then came back to meet

19   with the Government -- was my understanding from one of the

20   attorneys in the case.  So it is just not an unusual place to

21   go.  Again, this would be an issue if he had never gone.

22             (Counsel confer.)

23             MR. FINDLING:  So my counsel is telling me there's

24   a MLAT since 2022 with the UAE.

25             (Pause.)

1          MR. FINDLING:  Your Honor, on the -- so on the

2    issue of flight, I'm glad Pretrial Services took the position

3    that under certain circumstances -- particularly, I think,

4    mirroring what we're suggesting for Mr. Banks -- flight is

5    not an issue.  I'm kind of at the point where I can't believe

6    I've been doing this career so long, but I actually find in

7    cases like this flight is really not an issue, and here's why

8    in this particularly, subjectively, flight is not an issue:

9          The Government's position is that Mr. Banks, who's

10   internationally known -- internationally known,

11   internationally recognized, with his presence on everything

12   on the internet, hard copy, in magazines, TV -- is going to

13   somehow go on the run, go on the lam, and when he does that

14   -- when he does that, not only give up this career that he's

15   built to escape poverty so that he can provide for his family

16   -- you can see that in the bail package he's bought his mom a

17   beautiful home that he's willing to put as part of the

18   package to secure his appearance.

19         But he's going to leave his wife.  He's going to

20   leave the two children he has with her and his six other

21   children -- he's going to leave eight children that -- I know

22   Pretrial Services dotted their I's and crosses their t's to

23   know that he has always financially stepped up and assumed

24   the responsibility of taking care of his children.  He's

25   going to leave his mom, who he gave this life to.  He's going

1    to leave his dad, who he waited 26 years so he can have this

2    relationship, a relationship that was interrupted because in

3    2019 his dad gets out and then we all get slowed down for two

4    years from COVID.  So he's finally first embracing this

5    loving relationship with his dad, enjoying being part of the

6    same faith together.

7            But he's going to leave his dad, he's going to

8    leave his wife, he's going to leave his kids, he's going to

9    leave his career, and -- we're going to get to in a second --

10   leave the amazing community work that he's done, respectfully

11   to Mr. Brayman, not just locally, throughout the

12   United States.  I mean, this is -- as we've found out, this

13   isn't a hip hop performer that gives away backpacks on

14   Labor Day Weekend and a few turkeys.  This is an incredible

15   amount of community service that he does on a regular basis.

16   He's going to give all that up.  And I just think that

17   there's nothing to indicate that, particularly with this new

18   theory that he's going to Mexico because I -- I can't respond

19   to that because I don't know anything about that.

20           The other issue that we have to address,

21   Your Honor, is whether or not he is a threat to the safety of

22   any other person and the community.  Now, this is an

23   important issue that -- and when we deal with him -- let me

24   just say this, Your Honor, based on what the Government said.

25   The Government conflates him individually and him with OTF,

 1  "Only the Family," which Mr. Brayman went into a little bit.

 2  I'm going to distinguish the two of those for you for a

 3  second, and first I want to talk about him individually.

 4            So -- one second.

 5            (Pause.)

 6            MR. FINDLING:  The -- one second.

 7            (Counsel confer.)

 8            MR. FINDLING:  So, Your Honor, if you look at the

 9  --

10            (Counsel confer.)

11            MR. FINDLING:  If you look at the indictment, and I

12  will tell you in the indictment the -- you know, every time

13  we read one of these we kind of look for that proverbial

14  "smoking gun."  And if you look at page 2 of the indictment

15  -- excuse me -- page 3 of the indictment, paragraph 6, it

16  says (reading): Following the attempted murder of T.B. and

17  the murder of S.R., Defendant Banks sought to commercialize

18  S.R.'s death by rapping about his revenge on T.B. with music

19  that explicitly references audio from a news clip taken

20  shortly after S.R. --

21            THE COURT:  You're quoting from the indictment?

22  Page 3 of the indictment?

23            MR. FINDLING:  Yes, Your Honor.  Page 3 of the

24  First Superseding Indictment, paragraph 6.

25            THE COURT:  Okay.

1            MR. FINDLING:  Yes.

2            THE COURT:  Got it.

3            MR. FINDLING:  (Reading) Following the attempted

4    murder of T.B. and the murder of S.R., Defendant Banks sought

5    to commercialize S.R.'s death by rapping about his revenge on

6    T.B. with music that explicitly references audio from a news

7    clip taken shortly after S.R.'s murder when T.B. screamed,

8    "No.  No," after saying S.R.'s dead body.

9            And then it has the lyrics.  I don't -- Your Honor,

10   can look at the lyrics.  I don't want to embarrass myself and

11   try to do that.

12           And so the big thing there is -- the proverbial

13   "smoking gun" is that this incident takes place and months

14   later Mr. Banks puts out a song to celebrate it and

15   commercialize it.  Immediately, when we got in the case, we

16   heard from people in the music industry that read about this

17   because it became a big news story.  The press loved this,

18   him celebrating and doing that, and everybody said, "Hold on

19   a second.  When you do music, you don't just record a song.

20   It is a long process."  Not unlike movies; right?  We're here

21   in L.A.  Sometimes they'll make a movie in 2022, and it

22   doesn't come out until 2024.  It's the same exact thing in

23   music.

24           Your Honor, we -- that song was recorded

25   approximately eight months before that incident took place.

1  We have a declaration by the music producer, Justin Gibson,

2  we have all the timestamps from the producer, and you could

3  see that this takes place -- instead of August '22, when the

4  incident takes place, this music was produced, these lyrics

5  performed by our client approximately seven months before, in

6  January of 2022.

7            I'm going to show this to the Government, then

8  tender it to the Court.

9            MR. YANNIELLO:  Your Honor, we actually object to

10  this proffer, this line of argument.  The bottom line is

11  there was a video that was filmed showing defendant's rival

12  screaming, "No.  No," that was placed over these lyrics.  So

13  independent of when the lyrics were actually written and

14  whether this was about Mr. Banks sanctioning some other

15  murder -- which the Government submitted evidence showing

16  that there were other monetary bounties placed on rivals and

17  to solicit murder.  So independent of who this was ultimately

18  about, the commercialization and this allegation is

19  nonetheless valid.

20            And I also would object to counsel's point the

21  "proverbial smoking gun."  The indictment lists significant

22  evidence related to Mr. Banks's involvement in the criminal

23  activity.

24            MR. FINDLING:  Look.  Your Honor, I -- let me say

25  this about this issue because we really discussed the ethics

 1    of this situation.  And I want counsel to know I'm not saying

 2    counsel tried to slip one, you know, by anybody, but I know

 3    that counsel relies on agents to make their case.  They're

 4    not out there doing -- they're relying on agents to make this

 5    case.

 6         This was presented to a grand jury, and

 7    respectfully, somebody testified in front of the grand jury

 8    about paragraph 6, and paragraph 6 does not echo the

 9    sentiment of what you just heard from the Government.

10    Paragraph 6, as presented to a grand jury, specifically said

11    that these lyrics were composed and produced to celebrate

12    this shooting incident that is the heart of this case, and

13    that is provably false, and had anybody -- had any of our

14    clients who had been subpoenaed to a grand jury done

15    something like that, they would be in big, big trouble.

16         So this is an important issue when the Court is

17    determining, particularly, the second part of this analysis

18    because we know the Pretrial Service Report says, "Hey, we

19    think under the right conditions, we can ensure that he will

20    show up for court as required by Your Honor, but we're

21    concerned about dangerousness."  And this is as big a fact as

22    any when you read the indictment.  I could tell you, for what

23    it's worth, it's the one the press wants to write about the

24    most, and it's just provably false.

25         So if I could present it to the Court?

 1          THE COURT:  You can present it but I -- it would be

 2   helpful if you focused on your argument on the allegations

 3   that suggest that the defendant presents a danger to the

 4   community, and the consistency and timing of the lyrics has

 5   some relevance --

 6          MR. FINDLING:  Okay.  Understood.

 7          THE COURT:  -- but marginal to the dangerousness

 8   issue, which is the issue before me today.

 9          MR. FINDLING:  Understood.  Understood.

10          MR. YANNIELLO:  And, Your Honor, if I may just to

11   clarify the record.  Mr. Findling was arguing, I understand,

12   very passionately about it.  There's nothing in paragraph 6

13   that talks about when it was produced or written.  So the

14   Government, again, objects with that -- or objects to that

15   characterization and disagrees with it.

16          (Pause.)

17          THE COURT:  All right.  You can provide the

18   information to my courtroom deputy.

19          MR. FINDLING:  Okay.  Thanks.

20          (Pause.)

21          MR. FINDLING:  So, Your Honor, regarding these

22   relevant time periods that we are -- that we are talking

23   about, there is -- all we know is we got hit with something

24   last night about some confidential informant -- of what a

25   confidential information says, but we have nothing presented

1  by the Government as part of this hearing that is showing any

2  violent activity during this relevant time period by our

3  client.  I mean, I do these hearings relentlessly, and

4  they're involving a shooting incident and a stabbing incident

5  and a fighting incident, and other than some unknown incident

6  that he's not charged for out of Chicago -- there's no

7  charges out of Chicago.  Mr. Brayman has done a yeoman's job

8  at trying to keep up with that.  There's no apparent case in

9  Chicago -- we have nothing.

10        The only thing that we are given is a dismissed

11  case in Fulton County and some unknown person that's a

12  cooperator that's casting allegations at our client.  Other

13  than that, there's nothing of substance to indicate that he

14  is the perpetrator of violent activity, and particularly

15  because this incident resulting in this case takes place in

16  2022.  I mean, it -- we're now in -- well excess of two years

17  goes by, and there's nothing to indicate that there's

18  anything hands-on that he's been involved in.

19        The only thing he's been involved in is what I'm

20  about to now turn to, and that is -- and you'll note that in

21  one of the footnotes an agent says something to the effect

22  that he tries to distance himself by involving himself in

23  community service, and that can't be anything further from

24  the truth.  From 2020 through this period of time, while

25  there's nothing provable, substantive that the Government

1    could tender you to show that he's a threat to people, that

2    he's violent, okay -- we can do that, and we can show you

3    exactly what Mr. Brayman was referencing, and that is the

4    robust community service that he's been -- that he's been

5    involved in.

6              (Pause.)

7              UNIDENTIFIED SPEAKER:  Judge, may I approach?

8              THE COURT:  Yes.

9              (Pause.)

10             MR. FINDLING:  So here's what our client has done

11   in the relevant periods that we're actually talking about,

12   right, from 2020 to 2024.  He's established the

13   Neighborhood Heroes Foundation.  During COVID -- you can see

14   from this he's actively involved in giving support to the

15   folks that were helping all of us survive during that period:

16   medical workers, first responders.  And this wasn't some --

17   as I said, some kind of, you know, give away a few turkeys

18   and give away a few backpacks.  We're talking about the

19   employment of an executive director, Mr. Freeman, who's here

20   with us today, a professional at working with nonprofits;

21   having a chairman of the board; having a board of directors,

22   and his outreach is not only in Chicago but was in Atlanta

23   and even Houston and elsewhere.

24             So during this period of time, he's literally

25   physically involved in extensive work with the community.

1    That's provable.  That's not hearsay.  That's not coming from

2    somebody that's trying to cut a deal and help themselves in

3    whatever case that they have.  That's provable work by

4    business executives that have joined with him through this

5    tremendous effort.  So that's, Your Honor, what we do know.

6           The Government referenced -- and I said that there

7    was kind of this conflating of him and Only the Family.

8    Only the Family, Your Honor -- and I'll be happy to share

9    with the Court, Only the Family was duly incorporated in

10   2012.  We've interviewed extensively the transactional lawyer

11   from Chicago that did that.  It is a -- it is a corporation.

12   And at the same as -- you can see that Mr. Banks -- he signs,

13   again, with -- he eventually signs with Alamo, which is a

14   division of Sony.  The COO of Sony -- of Alamo division of

15   Sony is here supporting him.

16          If you'd be kind enough to stand up.

17          So this division of Sony stands by his side.  You

18   can actually see that they have pledged that, if he's able to

19   put together his bail package, they will put up $1 million in

20   cash to support him.  All right?  But that's him

21   individually.  But in the music world, as we have learned,

22   there's your individual success, but what everybody wants to

23   do is to also start your own label, and that's what he did

24   with OTF, Only the Family, because to sign other people and

25   to build your industry, you have a greater profit center, and

1   that's what he did in 2012, and so in 2012 he duly

2   incorporates and starts Only the Family.

3          And then that grows, and in 2020 and 2021, he

4   reaches a relationship for Only the Family with Epic Records,

5   a distributor out of San Francisco.  And so he's not only

6   incorporated, but now he extends that and broadens it by

7   entering into a relationship with Epic Records out of

8   San Francisco, and the agreement there is that

9   Only the Family has to get other artists, and they actually

10  commit to getting another artist, each artist, I think, has

11  to put out 17 songs each, and they recommit from 2020 to

12  2021.

13         And then last year he reaches yet another agreement

14  with a -- another division of Sony, AWAL, where

15  Astronaut Sounds, which is his LLC that does its transactions

16  as Only the Family through yet another transactional lawyer

17  -- very, very well-known -- Hector Baldonado, one of the

18  biggest entertainment lawyers in the country -- reaches this

19  deal with AWAL, which is now sold for, like, a billion or

20  $2 billion to Sony so that OTF can have a relationship with

21  that division.  Mr. Norva Denton from AWAL division of Sony

22  is here.

23         (Counsel confer.)

24         MR. FINDLING:  If you'd stand up.  Thank you, sir.

25         MR. YANNIELLO:  Drew, my apologies to interrupt.

1         But, Your Honor, we'll stipulate to the defendant

2   being a successful music artist.  This case isn't about that.

3   It's about his control of the label that he referenced here,

4   OTF, but, more importantly, the violent crime that's at issue

5   here.  So Your Honor asked counsel to address the specific

6   issue of danger, and, again, we don't see any of this as

7   being relevant to that.

8         MR. FINDLING:  Well, it is, Your Honor, because the

9   indictment specifically says that OTF is a violent gang.

10  OTF is a duly incorporated organization that has reached a

11  relationship through transactional lawyers with two major

12  corporations, corporations that vet the people that they do

13  business with.  I don't think a division of Sony is going to

14  sit down and create a deal for hundreds of thousands of

15  dollars with Only the Family, and specifically Durk Banks, if

16  through their vetting process they think that they are

17  getting in bed with a criminal organization led by a criminal

18  gang leader.  I don't think that Alamo Records, another

19  division of Sony, is going to do that either.  I don't think

20  Empire Records out of San Francisco -- extremely well-known

21  in corporate circles -- is going to get in that relationship.

22        So the Government's picture that they've presented

23  to Your Honor and that is in those documents that are part of

24  the record is that all he is, is a gang leader, and that's

25  just not true.  And so we don't know about the actions of

 1  others, we don't know what other people are responsible for,

 2  but we know this: that there is nothing that shows during

 3  this relevant time period, other than complete conjecture,

 4  that Durk Banks has himself done anything, and the reason

 5  these are relevant facts is because you have to balance,

 6  respectfully, that conjecture from provable facts because

 7  those are not provable facts.  These are provable facts.  So

 8  I appreciate the stipulation because the stipulation is that

 9  he's a law-abiding citizen.  The stipulation is that he's no

10  different than any other person trying to establish a

11  corporate entity so that he can succeed individually and

12  collectively for his organization and for his family.

13          And so I think that it's the Government that has

14  not been able to, in a very brief recitation, show that

15  somehow he is a threat to everybody in the community.

16  Because other than this isolated incident that other people

17  are directly involved in, not him, they have not been able to

18  put their finger on anything other than an email at

19  10:00 o'clock last night about a case that he truly has

20  nothing to do with, that prosecutors not pursued him in

21  another jurisdiction.

22          And so we understand that bail is not guaranteed,

23  but there has to be from the Government's perspective -- from

24  their perspective, not ours, a certain balance that they have

25  to exceed, and that just hasn't happened here.  So, yes,

1  we're loading down with things because -- we're doing that

2  because we'd be doing it if he were in the insurance

3  business, we'd be doing that if he were a lawyer or a CPA,

4  and I think it's important for the Court to balance these

5  personal and professional successes.

6          And more importantly, if the documents that you

7  indicated -- and I appreciate that you reviewed -- at the

8  beginning say, "OTF," "OTF," "OTF" -- for this Court to

9  understand that he has taken every step that you would expect

10 somebody that's really -- I mean, look at his education;

11 right?  It's in the report.  He doesn't even have his GED,

12 but he knows enough to go from one transactional lawyer,

13 local in Chicago, to then getting to the point just in the

14 last two years where he hired one of the most well-known

15 transactional lawyers in America to take Only the Family and

16 himself to yet another level.  All those are things to be

17 taken into consideration.

18          And so I think if we couple that, Your Honor, with

19 the package -- and I appreciate you looking at -- we think

20 that, as the Court knows, under the Bail Reform Act, we need

21 to -- the Court needs to, respectfully, look at the least-

22 restrictive condition or combination of conditions that will

23 assure that Mr. Banks will appear and also for the safety of

24 the community.

25          And so I don't think -- you know, the Government's

1    response in their filing is that he's trying to use his

2    money, and honestly, I don't even understand how I'm supposed

3    to respond to that.  If you don't have money, then you have a

4    problem.  If you have some money, you're trying to use it to

5    create conditions that will work, and that's what we're

6    trying to do for Your Honor.

7            We've been in contact through his management.

8    We're ready to put him in a property.  I'm not going to say

9    it out loud.  The Court has the location.  We have really

10   taken the issue of security seriously.  I want the Court to

11   know that in good faith we have perused cases that we've

12   worked on and our colleagues around the country.  We tried to

13   put conditions that are similar with some other very similar

14   cases with very similar charges around the United States, and

15   so we're trying to create a 24/7 security.

16           And I want the Court to know that, if the Court

17   thinks that this is a threshold and you want us to take it up

18   a notch or 12 notches and it takes us a month to satisfy what

19   the Court wants us to do, we'll do that.  We just thought we

20   would go for what we thought was as strict as possible.

21           And so we like the security company that we

22   interviewed.  We've studied the qualifications of literally

23   -- we literally studied the qualifications of each and every

24   person.  So you could see in our package that we've offered

25   with the security company -- we didn't want people that have,

1    you know, played college football and stopped playing college

2    football and were bouncers at a bar and now they'd be

3    security.  You'll note that we provided you with the

4    background of every single person that will be there 24/7 --

5    each one of them.  We vetted each of them when we selected

6    this company.

7         You -- we've provided the information regarding his

8    employment, because that's an issue, and that's where you see

9    from the COO of Alamo he can continue in a way that would be

10   agreeable to be employed if he could do it while he's in

11   detention -- home detention.  We can work that out.  That's

12   happened with others.  There are ways that I know through

13   other similar cases, if the person is permitted to be

14   employed, they can do that work at home.  They can literally

15   -- we picked a home that we -- if it was possible, he can

16   record music.  If the Court wanted a system where we had to

17   review lyrics, we've done that as well.  Our -- Marissa and

18   my associates say they're the only lawyers in America that

19   went to law school and have to read lyrics.  But if we need

20   to do that -- whatever we need to do, as restrictive as the

21   Court says, we will do.

22        We've listed, as required, his finances.  Regarding

23   the properties, we furnished the information.  You could see

24   we gave you unencumbered property, both in Braselton,

25   Georgia, and Northern Gwinnett County, a very popular

1   suburban county in Georgia.  I think we have one property at

2   1.6-, one at 7-.  That combines for $2.3 million of

3   unencumbered property that we'll pledge.

4            We've -- Your Honor knows that we already have a

5   million-dollar cash commitment.  I could tell you, if the

6   Court says to us, "I think that it needs to be financially

7   this number," we have offers coming in by people in the

8   business world, literally people in the business world that

9   so stand behind Mr. Banks.  These offers are coming in.  We

10  literally put the pause button because we want to see if the

11  Court says, "You know what?  This is really good enough."

12  Not many people can do something like this, but if the Court

13  says given the facts and circumstances of this case it needs

14  to be X dollars, then we'll take the time to reach that, but

15  we have no doubt that with the business community that's

16  reached out to us -- and I don't mean the music community.  I

17  mean the business community that's reached out -- we can

18  achieve additional equity or third-party guarantors.

19           We think that this combination constitutes a

20  sufficient bail package under this set of circumstances, and

21  we're willing to entertain any suggestions or questions that

22  the Court may have.

23           If I could just ask my cocounsel anything else they

24  want me to add?

25           THE COURT:  Certainly.

1          (Counsel confer.)

2          MR. FINDLING:  That's all, Your Honor.

3          THE COURT:  All right.  Thank you, Counsel.

4          I note that Pretrial Services is here.  Does

5    Pretrial Services have anything that you would like to add

6    with regard to the -- your report and recommendation?

7          FATIMA VAZQUEZ:  Good afternoon, Your Honor.

8    Fatima Vazquez with Probation and Pretrial Services.

9          Nothing further, Your Honor, from us.  Thank you.

10          THE COURT:  All right.  Thank you.

11          All right.  Does the Government have a response?

12          MR. YANNIELLO:  Briefly, Your Honor.

13          THE COURT:  And if you could please go to the

14    lectern.

15          MR. YANNIELLO:  Sure.

16          So, Your Honor, most of what counsel just

17    articulated, again -- I objected twice -- I don't see it as

18    responsive or relevant to the narrow issue before Your Honor,

19    whether or not conditions or combination of conditions can

20    reasonably assure the defendant's appearance or mitigate

21    danger to the community.

22          So what essentially has been offered is Mr. Banks

23    has offered a small portion of his net worth and then

24    sureties by others, including a corporate surety, and then a

25    security company that's offering physical security.  As the

1    allegations in this case make abundantly clear, Mr. Banks

2    wasn't on the street pulling the trigger.  He was the one who

3    allegedly orchestrated it.  He was giving the greenlight to

4    book the flights.  In fact, as one of -- as an OTF associate,

5    somebody working for the label, was booking the flights for

6    five coconspirators to fly to L.A. to commit this murder,

7    Mr. Banks, as alleged in the indictment, sends a text

8    message, "Don't put my name on those flights."  So Mr. Banks

9    knew exactly what was going on, and he helped facilitate this

10   murder as the leader of the organization.

11          Counsel didn't really address much of what the

12   indictment actually alleges and instead focused on the

13   portion that referenced rap lyrics, but we'd submit to

14   Your Honor the indictment is lengthy and includes allegations

15   that show Mr. Banks's significant involvement in the murder.

16          With that, again, the murder was committed through

17   intermediaries, and the physical surveillance company that

18   counsel is offering to mitigate flight and danger really

19   offers no mitigation to that, that he could still -- nothing

20   about that prevents him from intimidating witnesses,

21   instructing intermediaries, sending text messages.  So the

22   Government stands by its briefing and requests that the Court

23   detain the defendant.

24          MR. FINDLING:  Your Honor, if I can --

25          THE COURT:  All right.  Thank you, Counsel.

42

1          MR. FINDLING:  If I can add: We'd be willing to

2    surrender telephonic communication devices.  You know, we're

3    -- again, we're -- we've been -- Ms. Goldberg and I have been

4    through this before.  If there's a rule regarding telephonic

5    communication devices, we would abide by that.

6          And we also have reached out to a third party --

7    which is unusual in federal cases, but if the Court wanted a

8    bonding company to be a third party involved, we've already

9    made contact and have one that's willing to get involved, if

10   necessary.

11         THE COURT:  All right.  Is there anything further

12   from the defense?

13         MR. FINDLING:  No, Your Honor.

14         THE COURT:  From the Government?

15         MR. YANNIELLO:  No, Your Honor.

16         THE COURT:  All right.  I have reviewed the

17   materials that were -- I indicated at the beginning of the

18   hearing -- that I identified at the beginning of the hearing,

19   and I have also reviewed the materials that were submitted by

20   the defense at the hearing, the e-ticket itinerary and

21   receipt and the Neighborhood Heroes Foundation -- it's, like,

22   a printout from a slide deck that looks to be about 30 pages,

23   which counsel referenced during the argument.

24         All right.  Based on the violations that are

25   charged -- with which the defendant is charged in the

1  First Superseding Indictment, there is a presumption in this

2  case that the defendant is both a danger to the community and

3  a risk of flight.  The defense has the burden of producing or

4  proffering evidence to rebut the presumption, and the defense

5  has proffered a considerable amount of evidence, which the

6  Court has taken into account.  The presumption does

7  nonetheless remain in the case, although I will note that the

8  -- particularly with regard to the risk of flight, the

9  defense has proffered considerable information.

10          And I recognize the community service that is

11  reflected in the documents that have been provided by the

12  defense.  The issue before this Court is very narrow, which

13  is whether there are condition or combination of conditions

14  that can reasonably assure the safety of the community, as

15  well as the appearance of the defendant as required.  It's

16  not an issue before this Court whether the defendant is or is

17  not a member of a gang or how his family organization is

18  characterized.

19          With regard to both flight risk and danger, based

20  on all of the evidence, I do find that there is no condition

21  or combination of conditions that will reasonably assure,

22  first of all and most significantly, the safety of the

23  community and any other person, and this is of course based

24  primarily on the allegations in the First Superseding

25  Indictment, and although the allegations are not that the

1    defendant personally pulled the trigger, the allegations are

2    that the defendant exercises a significant amount of control

3    over other individuals and that those individuals were acting

4    at his direction.

5           And I agree with the Government that the presence

6    of a security company providing security for the defendant is

7    not going to address the significant concerns with regard to

8    safety of the community here.  The security company would be

9    acting at the direction and under the guidance of the

10   defendant, and so I do not find that that addresses issues

11   regarding dangerousness.

12          With regard to a serious risk of flight, that is a

13   closer call.  I recognize that Pretrial Services concludes

14   that there are conditions that can be set that would address

15   the significant risk of flight.  However, I disagree and find

16   that there is no condition or combination of conditions that

17   will reasonably assure the defendant's appearance as required

18   given the fact that the record is replete with evidence that

19   he has significant resources and ability to leave the

20   jurisdiction.  Whether it is for an entity that the U.S.

21   Government can engage in extradition proceedings with or not,

22   he has the ability to, clearly, and resources to leave the

23   jurisdiction.

24          The bond package, although significant, would leave

25   the defendant with considerable resources, and his own

1 | actions in this case, which suggest that upon learning that

2 | the -- these charges were imminent -- charges, which I might

3 | add, carry a maximum sentence of life imprisonment -- induced

4 | him to make preparation -- apparently, hasty preparation to

5 | leave the country.

6 |         So for all of those reasons, the Government's

7 | request for detention on both of those bases is granted, and

8 | I will issue a written order.

9 |         All right.  Then is there anything further in this

10 | matter from the Government?

11 |         MR. YANNIELLO:  No, Your Honor.

12 |         THE COURT:  All right.

13 |         From the defense?

14 |         MR. FINDLING:  No, Your Honor.

15 |         THE COURT:  All right.

16 |         THE CLERK:  Court is adjourned.

17 |     (Proceedings adjourned at 3:29 p.m.)

18 | ///

19 | ///

20 |

21 |

22 |

23 |

24 |

25 |

1

2

3

4                            CERTIFICATE

5          I certify that the foregoing is a correct

6    transcript from the electronic sound recording of the

7    proceedings in the above-entitled matter.

8

9    /s/ Julie Messa_____        January 25, 2024_____
     Julie Messa, CET**D-403         Date
10   Transcriber

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25