TODD BLANCHE
Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
IAN V. YANNIELLO (Cal. Bar No. 265481)
Chief, National Security Division
MICHAEL J. MORSE (Cal. Bar No. 291763)
DANIEL H. WEINER (Cal. Bar No. 329025)
Assistant United States Attorneys
1400/1500 United States Courthouse
312 North Spring Street
Los Angeles, California 90012
Telephone: (213) 894-3667/3535/0813
Facsimile: (213) 894-0142
E-mail: ian.yanniello@usdoj.gov
michael.morse@usdoj.gov
daniel.weiner@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DURK BANKS,<br><br>Defendant. | No. CR 24-621(D)-MWF-6<br><br>GOVERNMENT'S OPPOSITION TO DEFENDANT BANKS' BRIEF IN SUPPORT OF RELEASE ON BOND; EXHIBIT A |

Plaintiff United States of America, by and through its counsel of record, Assistant United States Attorneys Ian V. Yanniello, Michael J. Morse, and Daniel H. Weiner, hereby files its opposition to defendant Durk Banks' Brief in Support of Release on Bond.

//

//

This filing is based upon the attached memorandum of points and authorities, the attached Exhibit A, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: November 4, 2026

Respectfully submitted,

TODD BLANCHE
Attorney General

BILAL A. ESSAYLI
First Assistant United States Attorney

IAN V. YANNIELLO
Assistant United States Attorney
Chief, National Security Division

*/s/*
IAN V. YANNIELLO
MICHAEL J. MORSE
DANIEL H. WEINER
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

Defendant Durk Banks' latest attempt to secure pretrial release pending his VICAR murder trial should be rejected. His proposed bond package pledges certain earnings and trots out celebrity endorsements, advocating for a carte blanche release order with a fleeting reference that he will be "in good hands" upon release. But defendant's conduct both in and out of custody show that no conditions can protect the community from a man who thinks he is above the law, and who will use his money and power to subvert and influence the fact-finding mission of his upcoming VICAR trial.

Defendant's history and conduct in the most-restrictive environment of the MDC shows that he simply cannot and will not abide by the rules and respect authority. Just last week, *after* he asked this Court to release him to the community, and *after* he was already disciplined for possessing and attempting to willfully destroy a contraband cellphone he possessed, defendant Banks *again* chose to knowingly violate MDC rules, refusing to comply with the guards' lawful orders.

And as described below, the racketeering charges defendant faces further demonstrate that he has used and will continue to use his position of power to exact revenge on his rivals, including by funding violent acts. At bottom, defendant's own conduct shows the hollowness of his promise to comply with the conditions imposed upon him should he be released. For the safety of the community and to ensure a fair VICAR trial, the Court should keep the status quo and order defendant to remain detained pending trial.

## II. BACKGROUND

### A. Defendant's Pattern of Violence and Funding Violence

The FSI alleges and evidence at trial will prove that defendant led a racketeering enterprise comprised primarily of Black Disciples, whose criminal footprint spanned the country, leaving a trail of violent acts and illicit operations nationwide, including the following: (i) the February 2019 robbery and shooting of Victim 1, where defendant --- a felon at the time --- produced a firearm and fired multiple shots at the victim; (ii) the January 2022 murder for hire of S.M., where the two shooters have already pleaded guilty in federal court to the crime; and (iii) the August 2022 murder of S.R., where two of defendant's co-conspirators were already convicted of conspiring to stalk and kill defendant Banks' rival.

### B. Defendant Has Been Ordered Detained Four Times

After four detention hearings, a magistrate judge and this Court have detained defendant each time. At the last hearing, on June 9, 2025, after briefing on reconsideration of bond, this Court again detained defendant pending trial. (Dkt. 202.) The Court cited to (1) defendant's October 2024 attempted flight before his arrest; (2) the "inadequacy of the financial conditions" in defendant's proposed bond package; (3) the "inadequacy of home detention" proposed by defendant; and (4) the "inadequacy of the release conditions" proposed by defendant. The Court noted that "the proposed release conditions would not prevent "[d]efendant from engaging in criminal conduct to frustrate the prosecution of this case." Id. 3-4.

## III. ARGUMENT

### A. Defendant Led a Prolific Criminal Enterprise

Defendant's offenses are calculated, brazen, deadly, and span thousands of miles over the course of years. His fellow enterprise members engaged in drug trafficking, coordinated procurement of stolen vehicles to be used during acts of violence, murder, attempted murder, and robbery. Indeed, two members and associates of the enterprise --- one of whom was defendant's top Black Disciple lieutenant --- were convicted at trial for their roles in the murder of S.R.

Defendant led the enterprise using his considerable power, money, fame, and influence. Among other things, the FSI alleges defendant and his close friend King Von brandished firearms (notwithstanding defendant's then-felon status) and attempted to shoot and kill Victim 1 over a stolen car debt in February 2019. The FSI further alleges defendant and other OTF members caused two hitmen (Anthony Montgomery-Wilson and Preston Powell) in Chicago to lie in wait and murder an enterprise rival. Those hitmen have subsequently pled guilty, admitting there "was a cash bounty for [S.M.]'s murder,"[1] they "participated in a conspiracy … to murder [S.M.] and collect the payment,"[2] and that Montgomery-Wilson "collected money that had been offered as consideration for [S.M.]'s murder"[3]. After the hitmen collected the murder bounty, Montgomery-Wilson displayed

---

[1] <u>United States v. Montgomery-Wilson et al.</u>, N.D. Ill. Case No. CR 23-546-TMD, Dkt. 187 [Powell Plea Agreement], at 3.

[2] <u>Id.</u>

[3] <u>United States v. Montgomery-Wilson et al.</u>, Case No. CR 23-546-TMD, Dkt. 179 [Montgomery-Wilson Plea Agreement], at 3-5.

his monetary reward on a social media post while playing an excerpt of defendant Banks' music that boasts about killing an "opp":




(FSI, ¶ 9(b).)

The FSI also alleges defendant had six hitmen to travel to Los Angeles to commit an execution-style murder in broad daylight. Defendant allegedly financed the murder plot and offered to reward the killers.

The result of defendant's first trial in which he chose to sever the gang-related, violent acts that will be shown in the VICAR case does nothing to change the dangerousness or flight risk analysis.[4]

[4] Indeed, defendant all but conceded at trial he tried to flee the country minutes after a co-conspirator alerted to defendant that

*(footnote cont'd on next page)*

He still faces the more serious and expansive criminal allegations that he chose not to go to trial on. Defendant cannot now use his severance request and this Court's indulgence of that request as a sword to circumvent, abbreviate or muddy the dangerousness or risk of flight inquiry.

**B. Defendant Banks' Repeated and Near-Continuous BOP Violations Shows There Are No Conditions to Ensure the Safety of the Public and/or Witnesses**

Since defendant was ordered detained in this case, he has shown a distain for and unwillingness to abide by even the simplest of conditions imposed upon him, including rules necessary to protect witness safety and preserve trial integrity and fairness. Among other violations, defendant has repeatedly attempted to conceal his communications by using other inmates' phone access, engaging in impermissible three-way calls, and smuggling in and using contraband communications devices to make hundreds of phone calls. Even on the eve of this hearing, defendant continues to defy BOP personnel and rules. Just last week, defendant refused to comply with instructions from BOP staff attempting to search defendant's prison cell for yet more contraband. His actions in an already-restrictive condition of confinement show he cannot and will not abide by bond conditions on his own accord, outside the purview of the USMS and BOP.[5]

---

his enterprise associates were subject to search and arrest (despite counsel's previous arguments in detention hearings that defendant Banks was not trying to flee the country and/or had existing plans to travel to Dubai for business).

[5] The government is also investigating additional, potential criminal violations related to defendant Banks facilitating the introduction of contraband at the MDC. See USAO_67439.

**C. Celebrity and Music Industry Character Letters Are Not Get Out of Detention Free Cards**

As he did at trial, in his brief to support release on bond, defendant has trotted out several celebrities in his support. This familiar playbook to apply public pressure to these proceedings, in search of preferential treatment, should be rejected out of hand by this Court. Indeed, during trial, defendant seemingly coordinated the high-profile appearance of several musicians to distract decisionmakers from the discharge of their duties, including a prominent celebrity who arrived during crucial cooperator testimony while somehow skipping the line of public spectators seeking admission to the court proceedings. That individual left after a brief stint donning dark sunglasses inside the courtroom.

Moreover, during trial, this orchestrated, organized, and well-funded attempt to dazzle and distract members of the public with perceived community support --- in spaces visible to then-sitting jurors --- was not confined to the courtroom itself. As the Court is aware, there was a groundswell of what appeared to be "Free Durk" support outside of the courthouse the day of closing arguments. But in response to an online whistleblower, the government learned that "Free Durk" "protesters" who surrounded the First Street Courthouse's entrances and exits during trial were, in fact, paid protestors, recruited using "casting calls," provided with signs, clothing, and

other paraphernalia, and paid for their time. Below is a screenshot of an Instagram post used to recruit these paid protestors.




(Bates 67423; see also Ex. A [Interview of G.D.].)[6]

---

[6] Defendant's supporters --- whether paid or not --- also took steps to intimidate and harass members of the press who were perceived as reporting information not helpful to defendant. See, e.g., "[A journalist] was confronted inside the courtroom and outside by clout chasers during the Lil Durk trial", available at https://www.instagram.com/reel/DcrhPLfKsUc/. The government anticipates filing a renewed request for a limited gag order before the VICAR trial to protect the integrity of the proceedings.

**D. Defendant's Proposed Bond Package Does Not Mitigate His Flight Risk or the Danger to the Community**

Defendant's proposed bail resources do not mitigate his danger to the community or sufficiently reduce his risk of flight. His funding and orchestration of the murder conspiracy shows that his proposed bail resources are woefully inadequate to mitigate the danger he poses. See United States v. Hir, 517 F.3d 1081, 1092 (9th Cir. 2008) (affirming district court's denial of proposed $600,000 secured bail package based on risk defendant posed to the community). This is especially true given defendant's proposal to entrust a private security company, *funded by defendant*, to supervise him outside of custody. (See Dkt. 163 at 5 ("The Court is not persuaded that supervision by a third party security company paid by Defendant addressed either the dangerousness or the serious risk of flight.") These proposed restrictions all suffer from the "critical flaw" in that "they depend on [defendant]'s good faith compliance" in order to be effective. Hir, 517 F.3d at 1092.

The allegations against defendant and his conduct to date demonstrate that the safety risk to the community and witnesses is too palpable to justify defendant's release. Indeed, defendant has already shown he will not abide by even simple conditions imposed upon him in custody. His actions and lack of respect in an already-restrictive condition of confinement show that there is a certain, appreciable risk that he cannot and will not abide by bond conditions on his own accord, outside the purview of the USMS and BOP.

To the extent defendant relies on the August 2027 trial date for the VICAR counts as a basis to justify his pretrial release, that

date was selected largely due to scheduling conflicts of defense counsel. The government remains prepared to proceed to trial on a more expedited schedule.

## IV. CONCLUSION

Defendant's release would pose a grave risk to the safety of the public, and witnesses and potential witnesses in this case. Defendant has already shown he is willing to use his power and resources to pursue violence. No condition or combination of conditions can ensure defendant's appearance or mitigate his danger to the community. The Court should order defendant detained.

# EXHIBIT A

FD-302 (Rev. 5-8-10)



OFFICIAL RECORD
Document participants have digitally signed. All signatures have been verified by a certified FBI information system.

UNCLASSIFIED//FOUO

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry 09/21/2026

On September 15, 2026, G[redacted] D[redacted] ("D[redacted]"), cell phone number ([redacted]) [redacted], e-mail address [redacted].com was interviewed telephonically by Federal Bureau of Investigation (FBI) Special Agent (SA) Christian Valadares and SA Jarron Farmby. After being advised of the identity of the interviewing Agents and the nature of the interview, D[redacted] provided the following information:

D[redacted] worked as a background actor in Los Angeles. D[redacted] frequently utilized Casting Network to find job postings and acting opportunities. She applied for a job on Casting Network and received text messages from them confirming she was selected for a job that paid $125.00 on September 8, 2026. The location for the job was the United States Courthouse located at 350 West First Street, Los Angeles, California, 90012.

D[redacted] thought the job was to portray a protester in a music video. When D[redacted] arrived at the location, she recognized people who worked similar jobs. D[redacted] also recognized that many of the individuals present wore t-shirts with "FREE DURK" written on them. D[redacted] learned the day of the job that she was protesting in favor of DURK BANKS ("BANKS") also known as ("AKA") "LIL DURK." D[redacted] had never heard of BANKS before that day.

D[redacted] learned that BANKS was involved in a murder for hire case and that was not what she signed up for. Coffee and lunch were provided to the protesters. One of the food trucks was called House of Wings. A parking structure was rented for the protesters.

D[redacted] possessed screenshots of the job posting and video recordings she obtained during the protest, including an individual who requested that she remove the posts.

[Agent Note: Video postings, notes, screenshots and photographs will be attached as a 1A within this submission.]

UNCLASSIFIED//FOUO

Investigation on 09/15/2026 at Los Angeles, California, United States (Phone)

File # 166C-LA-3730445 Date drafted 09/15/2026

by VALADARES CHRISTIAN ARAUJO REIS, Jarron Farmby

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.